UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
UNITED STATES OF AMERICA   )
                              )
                              )
v.                                  )       Criminal No: 18-cr-10250-DJC
                              )
BRANDON ZIOBROWSKI     )
_____)

### DEFENDANT'S MOTION TO DISMISS
### AND MEMORANDUM OF LAW

Now comes the Defendant, Brandon Ziobrowski, and hereby requests this Honorable Court dismiss the indictment, one count violation of 18 U.S.C. § 875(c). 18 U.S.C. § 875(c) is facially defective because it seeks to criminalize political speech, which is one of the most highly protected forms of speech under the First Amendment. Under the statute, the term "threat" is not defined, and as a result, the statute risks encapsulating protected political speech in its reach. As a result, the statute is constitutionally defective as applied in this case. Even if the Court finds the statute constitutionally firm as applied, the protected political speech in this case does not fall under the reach of the statute.

The legal framework of analyzing the constitutionality of a statute that criminalizes political speech requires consideration of the speech in question within the context of the speaker's history of making hyperbolic statements and the existing political controversy and debate. In Mr. Ziobrowski's case, he is indicted with making a hyperbolic statement in a political environment where the president of the United States and his supporters repeatedly use similar language to make a political point. Mr. Ziobrowski has a history of using vitriol and sarcasm to

1

express his outrage and disgust over what he perceives as governmental overreach. His prior statements, as well as the one that he is indicted for making in this case, are similar to statements those opposed to his position including the president utter in public. His statement within this context cannot be understood to constitute a true threat within the meaning of the statute.

The following memorandum is submitted in support of Mr. Ziobrowski's motion to dismiss and addresses the pertinent issues as follows. Firth, the statement of facts will discuss the history of Mr. Ziobrowski's political speech and the political environment within which his statement was made. Then the legal argument first sets forth the scope of the First Amendment and the highest constitutional protection afforded to political speech. Mr. Ziobrowski then addresses his argument that the statute is unconstitutional as applied in this case. Finally, the memorandum concludes by showing that none of the recognized exceptions to the First Amendment apply to the political speech made by Mr. Ziobrowski.

## STATEMENT OF FACTS

"I may not agree with you, but I will defend to the death your right to make an ass of yourself."
— Oscar Wilde

Mr. Ziobrowski has been a long-time political commentator who, at various times, uses offensive words to express his opinions on social media. On July 2, 2018, Mr. Ziobrowski tweeted the subject of this indictment: "I am broke but I will scrounge and literally give $500 to anyone who kills an ice agent. @me seriously who else can pledge get it on this let's make it work." He was subsequently arrested and charged with violating 18 U.S.C. § 875(c), which provides: "Whoever transmits in interstate of foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

As evidenced in the discovery obtained from search warrants for Mr. Ziobrowski's social media accounts, Mr. Ziobrowski has a lengthy history of expressing his opinions on social media platforms. Specifically, in 2018 he tweeted, *inter alia*:

- "Step one: implant a bomb in every kids (sic) head. If they try to act up the teacher can just blow them up with a switch. No more school shootings. Now on to fix the rest of America's problems"
- "Guns should only be legal for shooting the police like the second amendment intended"
- "We should have exterminated the south when we crushed their rebellion. Hindsight is 20/20 ¯\\_(ツ)_/¯"
- "Thank you ICE for putting your lives on the line and hopefully dying I guess so there's less of you? https://t.co/ qIUPQ2OuRB"
- "Hey I haven't tweeted this in a while but we should still kill the rich and redistribute their wealth"
- "Didn't think I have to say this but if you watch cop shows, especially post 9/11, you're a cop. Stop masturbating to simplistic narratives that glorify state violence"
- "Can't wait to get killed by an honor student"
- "Go shoot someone over the right to a speedy trial. Or better yet women's rights, or literally anything else. Until that happens these arguments mean less than nothing. They're just a threat to kill anyone who doesn't want guns everywhere"
- "The democratic party wont (sic) form a dissent platform around concentration camps for children. They're so lazy and stupid and can't wait to die"
- "I'm staying at the large seaside summer home of a wealthy aunt with a cast of odd characters and there have been ZERO murders. Believe me I'm fucking pissed."
- "@realDonaldTrump Fuck you nazi"
- "@ICEgov Fuck you nazis"
- "@ICEgov cool cool so a nazi platoon"
- "Politicians are the enemy and always have been you dumb shits"
- "I can't believe John McCain isn't dead yet"
- "John McCain made a deal with the devil not to die until we have concentration camps in America"
- "*Cop shoots 4 or 5 black children*\n"Sir, (sic) SIR, excuse me SIR. THEY do not like that very much."\n"I (sic) will continue to murder them thank you for your tolerance."\n"Or (sic) course! I am a leftist, I could do no less""
- "Thank you Anthony Kennedy, ghoulish psychopath who for some reason we call a swing vote because uh he didn't want to execute children and the mentally disabled"
- "@marcorubio shut the fuck up you shit people are dead"

It should be noted that similar speech extends back into March, 2009, though there is no evidence that Mr. Ziobrowski acted in furtherance of any alleged threats. Specifically, from 2009 to 2017, he has tweeted *inter alia*:

- "Holy shit Philly is closing their public libraries. Fuck you America. Fuck your face. You don't even understand what will keep you alive."
- "Oh Scalia when are you going to die already?"
- "Hey all asshole Ohio senators with gay sons: shut the fuck up you human garbage. Die. Open your worthless acid pumping veins tonight and die"
- "We are all terrorists."
- "Netflix is not working. The error report says it's sending \"bad data;\" we live in an age of wonder. I'm going to kill someone."
- "Imagine you could go back in time and kill Hitler/ Stalin/Mao. #KILLBenjaminNetanyahu"
- "Got a strong feeling I'm gonna (sic) go Lord Of The Flies on my trashboy (sic) (almost ex-) roommate this week."
- ".@realDonaldTrump kill yourself"
- "I'm not pro death but I literally don't care about cops."
- "If they really want to disrupt the system they'll make a gofundme to kill Donald Trump"
- "When I read my own tweets I worry that I may be mentally unbalanced. #notreally #butreallymaybe?"

Due to Mr. Ziobrowski's extensive history of expressing his political opinions online, any comments are to be understood as comments on political issues of public concern. In fact, Mr. Ziobrowski is not the only one critical of the Immigration and Customs Enforcement Agency (ICE). In fact, the activities of ICE have been the subject of widespread political discussion and debate in the past two years.

An increasing number of news agencies, organizations, and individuals have expressed concern on social media sites regarding the harsh treatment of ICE detainees and migrants across the country. The Atlantic reported that the Trump Administration "radicaliz[ed] ICE" through a series of policy changes echoing anti-immigrant sentiment: "Even if putative fiascoes such as the initial Muslim ban and family separations at the border fail in court or are ultimately reversed, they succeed in fomenting an atmosphere of fear and worry among immigrants. The theatrics are, in effect, the policy." See Franklin Foer, *How Trump Radicalized ICE: A long-running inferiority complex, vast statutory power, a chilling new directive from the top—Inside*

*America's unfolding immigration tragedy*, THE ATLANTIC, Sept. 2018, available at

https://www.theatlantic.com/magazine/archive/2018/09/trump-ice/565772/.

The Pacific Standard Magazine reported: "Since the election of Donald Trump, not a

week goes by without some new outrageous story of overreach by various elements of

immigration enforcement." See David Perry, *Why Critics Say It's Time to Abolish Ice*, PACIFIC

STANDARD MAG., May 1, 2018, https://psmag.com/social-justice/abolish-ice. Perry continues:

"What's new, though, is that instead of criticizing specific cases and calling for reform—the

usual popular response to outrages—we're seeing increasingly widespread demands to abolish

ICE altogether." Id. See also Molly Roberts, *ICE deserves to be abolished*, WASHINGTON POST,

Mar. 13, 2018, https://www.washingtonpost.com/blogs/post-partisan/wp/2018/03/13/of-course-

democrats-should-want-to-abolish-ice/?utm_term=.1461dd391cc3, ("Those who want to abolish

ICE have a strong argument. They're not saying the agency is useless, and they're not saying it's

a money-sink. They're saying it does active harm"); Sean McElwee, *It's Time to Abolish ICE: A*

*mass-deportation strike force is incompatible with democracy and human rights*, THE NATION,

Mar. 9, 2018, https://www.thenation.com/article/its-time-to-abolish-ice/ ("The idea of defunding

ICE has gained traction among immigrant-rights groups horrified by the speed at which, under

President Donald Trump, the agency has ramped up an already brutal deportation process").

Agencies and organizations working with immigrants in individual cases and class action

suits against the Trump Administration have also echoed these sentiments. See

@RAICESTEXAS, TWITTER, (Apr. 25, 2019, 1:17 PM),

https://twitter.com/RAICESTEXAS/status/1121463183766622208, (".@ICEgov everyday you

violate immigrants (sic) human rights and due process. We won't stop until we

#EndFamilyDetention #AbolishICE"); @UNITEDWEDREAM, TWITTER, (Apr. 22, 2019, 12:29

PM), https://twitter.com/UNITEDWEDREAM/status/1120364010866712576 ("Under the racist Trump administration, ICE is emboldened to be less transparent, unaccountable and act with increased impunity. #AbolishDetention #AbolishICE #MeltICE"). Immigration attorneys have also spoken out against ICE. <u>See</u> @diegoatlaw, TWITTER, (Apr. 19, 2019, 5:35 PM), https://twitter.com/DiegoATLaw/status/1119353792837718016 ("Hey you guys / It's great y'all (sic) want to say #AbolishICE and that you love #immigrants / But you can do actual stuff you know / lawmakers think it's dangerous to pass pro-immigrant laws federally. You need to show that it's dangerous not to do so. / Get off your ass. Force them."); @luzenlafrontera, TWITTER, (Mar. 24, 2019, 3:47 PM), https://twitter.com/luzenlafrontera/status/1109904711786749954 ("ICE should be fucking abolished. We are literally operating a stormtrooper Gestapo force that terrorizes immigrant communities, & rips families apart. This is fascism. This is repression. & if you think that's hyperbolic, you obviously don't talk to many immigrants.  #AbolishICE").

Mr. Ziobrowski's comments are also to be considered in light of President Trump's and the GOP's hateful comments. Specifically, President Trump has stated:

- In a February 2016 speech at St. Anselm College in New Hampshire, President Trump claimed "I would bring back waterboarding and I'd bring back a hell of a lot worse than waterboarding." Andrew Buncombe, Donald Trump says he would bring back water-boarding and 'a hell of a lot worse', THE INDEPENDENT (Feb. 7, 2016, 3:27 PM), https://www.independent.co.uk/news/world/americas/us-elections/republican-candidates-clash-in-fiercest-debate-just-days-before-new-hampshire-vote-a6858816.html

- At a February 2016 rally in Las Vegas, President Trump stated in reference to a protester: "I'd like to punch him in the face." Jeremy Diamond, Donald Trump on protestor: "I'd like to punch him in the face', CNN (Feb. 23, 2016, 11:59 AM), https://www.cnn.com/2016/02/23/politics/donald-trump-nevada-rally-punch/index.html

- At a March 2016 rally in Missouri, President Trump stated in reference to protestors: "You know, part of the problem, and part of the reason it takes so long, is nobody wants to hurt each other anymore, right? And they're being politically correct the way they take them out, so it takes a little bit longer. And honestly, protesters, they realize it. They realize that there are no consequences to protesting anymore. There used to be consequences, there are none anymore." Anna Giaritelli, *Trump: Protestors should face*

*consequences*, WASHINGTON EXAMINER (Mar. 11, 2016, 7:10 PM),
https://www.washingtonexaminer.com/trump-protesters-should-face-consequences

- At a March 2016 rally in Missouri, President Trump stated in reference to an event earlier that day in which a protestor attempted to get on the stage: "He got over this railing, tries to make a rush at me. I was ready. I don't know if I would've done well but I would've been out there fighting, folks. I don't know if I would've done well, but I would've been 'boom, boom, boom, I'll beat the crap out of you." James Robenalt, *Could Trump's Hate-Baiting Lead to Another Kent State?*, POLITICO (Mar. 15, 2016),
https://www.politico.com/magazine/story/2016/03/donald-trump-2016-violence-kent-state-213733

- At a March 2016 rally in Michigan, President Trump stated in reference to protesters being removed from the venue: "Yeah, get him out. Try not to hurt him. If you do, I'll defend you in court. Don't worry about it." Gabriella Muñoz, *Maxine Waters: 'The President lied again'*, WASHINGTON TIMES (Jun. 26, 2018),
https://www.washingtontimes.com/news/2018/jun/26/maxine-waters-the-president-lied-again/

- At an August 2015 press conference in Michigan, President Trump stated in reference to protestors coming on stage: "I don't know if I'll do the fighting myself or if other people will." Serina Sandhu, *Donald Trump threatens to fight Black Lives Matter activists*, THE INDEPENDENT (Aug. 12, 2015, 11:05 PM),
https://www.independent.co.uk/news/people/news/donald-trump-threatens-to-fight-black-lives-matter-activists-10451119.html

- At a March 2016 press conference in Florida, President Trump stated in reference to his supporters fighting protestors at rallies: "He was swinging, he was hitting people, and the audience hit back. And that's what we need a little bit more of." Nick Gass, *Trump: 'There used to be consequences' for protesting*, POLITICO (Mar. 11, 2016, 1:15 PM),
https://www.politico.com/blogs/2016-gop-primary-live-updates-and-results/2016/03/trump-defends-protest-violence-220638

- At a February 2016 rally in Iowa, President Trump stated in reference to protestors: "Knock the crap out of him, would you? Seriously, okay, just knock the hell . . . I promise you, I will pay for the legal fees. I promise. I promise." Ben Jacobs, *Trump campaign dogged by violent incidents at rallies*, THE GUARDIAN (Mar. 11, 2016, 12:28 PM), https://www.theguardian.com/us-news/2016/mar/11/donald-trump-campaign-claims-violence-rallies

- In a 2015 phone interview, President Trump stated in reference to a protestor who was attacked at a rally: "Maybe he should have been roughed up." Jenna Johnson and Mary Jordan, *Trump on rally protestor: 'Maybe he should have been roughed up'*, WASHINGTON POST (Nov. 22, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/11/22/black-activist-punched-at-donald-trump-rally-in-birmingham/?utm_term=.2be422f5d589

- In a 2015 Twitter post regarding the Wall Street Journal, President Trump stated: "The @WSJ Wall Street Journal loves to write badly about me. They better be careful or I will unleash big time on them. Look forward to it!" Donald Trump (@realDonaldTrump), TWITTER (Oct. 31, 2015), https://twitter.com/realdonaldtrump/status/660460909761069057?lang=en

- In a 2018 Twitter post regarding former Vice President Joe Biden, President Trump stated: "Crazy Joe Biden is trying to act like a tough guy. Actually, he is weak, both mentally and physically, and yet he threatens me, for the second time, with physical assault. He doesn't know me, but he would go down fast and hard, crying all the way. Don't threaten people Joe!" Donald Trump (@realDonaldTrump), TWITTER (Mar. 22, 2018), https://twitter.com/realDonaldTrump/status/976765417908776963

- In a 2018 Twitter post regarding migrant caravans, President Trump stated: "Many Gang Members and some very bad people are mixed into the Caravan heading to our Southern Border. Please go back, you will not be admitted into the United States unless you go through the legal process. This is an invasion of our Country and our Military is waiting for you!" Donald Trump (@realDonaldTrump), TWITTER (Oct. 29, 2018), https://twitter.com/realDonaldTrump/status/1056885392522260480

- In a 2018 Twitter post aimed at Congresswoman Maxine Waters, President Trump stated: "Congresswoman Maxine Waters, an extraordinarily low IQ person, has become, together with Nancy Pelosi, the Face of the Democrat Party. She has just called for harm to supporters, of which there are many, of the Make America Great Again movement. Be careful what you wish for Max!" Donald Trump (@realDonaldTrump), TWITTER (Jun. 25, 2018), https://twitter.com/realDonaldTrump/status/1011295779422695424

- When asked whether President Trump was concerned about impeachment, he told a Reuters reporter: "I'm not concerned, no," the president told Reuters reporters about his potential impeachment during an interview in the Oval Office. "I think that the people would revolt if that happened." See Brent D. Griffiths, *Trump: People will "revolt" if he's impeached*, POLITICO, Dec. 11, 2018, 9:06 PM, https://www.politico.com/story/2018/12/11/trump-impeachment-white-house-1058779

Some of President Trump's threatening language has been memorialized in a political cartoon by Jesse Duquette. Jesse Duquette (the.daily.don), INSTAGRAM (June 30, 2017), https://www.instagram.com/p/BV_BNSUlF5g/



The political debate in the past two years has become so heated and vitriolic, the extreme nature of the president's comments has become the subject if inquiry by media outlets over concern that he may incite violence. Yet, the Administration, the same administration that brought this charge against Mr. Ziobrowski, has maintained the statements did not constitute a threat and were not susceptible to incite violence. According to MSNBC, after Americans learned of a suspected terrorist plot by a Coast Guard lieutenant who planned to kill democrats and journalists, a reporter asked Sarah Huckabee Sanders, the Press Secretary, whether Trump could "tone down his rhetoric." <u>See</u> Steve Benin, *Defending Trump, Sanders lies about his record on promoting violence*, MSNBC, (Feb. 22, 2019 10:11 AM), http://www.msnbc.com/rachel-maddow-show/defending-trump-sanders-lies-about-his-record-

promoting-violence. Sanders responded: "I certainly don't think that the president, at any point, has done anything but condemn violence – against journalists or anyone else. In fact, every single time something like this happens, the president is typically one of the first people to condemn the violence, and the media is the first people to blame the president." Id.

Recently, President Trump has attacked Representative Ilhan Omar on Twitter displaying imagery from 9/11 with audio of her comments about islamophobia. The Nation reported that despite his propagandist video,

> [ . . . ] she's the one under attack. Trump is literally putting her life in danger, yet the law does nothing to stop him. His threats and attacks are being amplified through inaccurate reporting by the Rupert Murdoch empire, both through the New York Post and Fox News, and yet they hide behind the freedom of the press. Trump is riling up his supporters on Twitter, a platform that is not even subject to the rigorous standards of the First Amendment, and yet people throw up their hands and say, "Well, freedom of speech."

See Elie Mystal, *Donald Trump Isn't Playing Games with Ilhan Omar—He's Inciting Violence; And he's going to keep inciting violence until someone gets killed*, THE NATION, Apr. 16, 2019, https://www.thenation.com/article/trump-inciting-violence-ilhan-omar/. President Trump has also attempted to "normalize" violence at the border. In a May 2019 rally in Panama City, Florida, President Trump was praising the border patrol's bravery in light of the fact that they do not carry weapons, when he questioned how to "stop these people." See Eric Levitz, *The President's 'Jokes' About Shooting Migrants Are No Laughing Matter*, NEW YORK MAGAZINE INTELLIGENCER, (May 9, 2019), http://nymag.com/intelligencer/2019/05/watch-trump-rally-shoot-migrants-panhandle-militia-detained.html. When a supporter shouted to shoot them, "The crowd exploded in laughter. Id. The president grinned and shook his head. "Only in the panhandle you can get away with that statement, folks," Trump said to applause." Id. After that rally, the Washington Post reported:

Trump's support for violence against those hoping to immigrate to the United States isn't an isolated incident. Last year, Trump defended U.S. agents using tear gas against Central American migrants, including children, at the border crossing in San Ysidro, a neighborhood in San Diego. And while discussing gang violence believed to be tied to illegal immigration, Trump encouraged police officers to be violent with those they suspect of committing a crime.

See Eugene Scott, *Analysis: For Trump and some of his supporters, violence against immigrants appears totally acceptable*, WASHINGTON POST, (May 10, 2019, 10:23 AM), https://www.washingtonpost.com/politics/2019/05/10/trump-some-his-supporters-violence-against-immigrants-appears-totally-acceptable/?utm_term=.4331b057b104. Additionally, Armando Gonzalez, a member of the New Mexico Militia Group allegedly questioned the apprehension policy, according to The Young Turks: ""Why are we just apprehending them and not lining them up and shooting them" . . . . "We have to go back to Hitler days and put them all in a gas chamber." See Ken Klipperstein, *'Put Them All in a Gas Chamber,' Said Border Militia Member: Report*, THE YOUNG TURKS, (May 6, 2019), https://tyt.com/stories/4vZLCHuQrYE4uKagy0oyMA/55ZimtgirWgUh9ZgMSPirI.

As this type of language has become normalized, politicians beyond the White House have also begun to use threatening language.

- Republican gubernatorial candidate for Pennsylvania Scott Wagner said over Facebook Live, in reference to the Democratic incumbent, "You better put a catcher's mask on your face, because I'm going to stomp all over your face with golf spikes." John Bowden, *GOP gov candidate says he will 'stomp' Dem opponent's face with 'golf spikes'*, THE HILL (Oct. 12, 2018, 2:41 PM), https://thehill.com/homenews/campaign/411176-gop-candidate-says-he-will-stomp-on-tom-wolfs-face-with-golf-spikes-in-ad.

Individuals with political motives have also used threatening language:

- People wearing "Make America Great Again" caps in support of President Trump told bookstore owners in Berkeley, California that they would "burn down" the bookstore and also called the owners "commie scum." Mythili Sampathkumar, *Trump supporters threaten to burn down a bookshop in California*, THE INDEPENDENT (Mar. 9, 2019, 7:55 PM), https://www.independent.co.uk/news/world/americas/donald-trump-supporters-bookstore-burn-make-america-great-again-berkeley-california-a8248721.html

- Individuals made threatening phone calls to Mr. Didier Jimenez Castro of Branchburg, New Jersey, leader of the "anti-Trump activist" group the People's Motorcade, after Mr. Jimenez Castro created a GoFundMe.com page to raise funds to purchase a President Trump "baby balloon." Cheryl Makin, *Trump supporters threaten 'Baby Trump' blimp activist's job at homeless shelter*, BRIDGEWATER COURIER NEWS (Jul. 18, 2018, 9:24 AM), [https://www.mycentraljersey.com/story/news/politics/2018/07/19/baby-trump-balloon-didier-jimenez-castro/800129002/](https://www.mycentraljersey.com/story/news/politics/2018/07/19/baby-trump-balloon-didier-jimenez-castro/800129002/)

It is, therefore, within the context of the heated political debate and controversy, the widespread use of violent and offensive language by administration officials including the president of the United States, that this Court must apply the statute to Mr. Ziobrowski's speech.

## ARGUMENT

### *Scope of the First Amendment*

The First Amendment states "Congress shall make no law [ . . . . ] abridging the freedom of speech." U.S. Const. amend. 1. The Supreme Court has long recognized the importance of the First Amendment, noting that "speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339 (2010). Accordingly, the Supreme Court has also recognized that "[t[he right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." Id. "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." Id. In describing the purpose for the exception, the Supreme Court has stated:

> The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. This objective was made explicit as early as 1774 in a letter of the Continental Congress to the inhabitants of Quebec:

The last right we shall mention, regards the freedom of the press. The importance of this consists, besides the advancement of truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are shamed or intimidated, into more honourable and just modes of conducting affairs.

See Roth v. United States, 354 U.S. 476, 484 (1957) (*quoting* 1 Journals of the Continental Congress 108 (1774)).

Given the importance of free speech to American political discourse, courts have been reluctant to uphold restrictions on speech. See Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 680 (1990) (Scalia, J., dissenting) (recognizing "the absolutely central truth of the First Amendment that government cannot be trusted to ensure, through censorship, the 'fairness' of political debate"). Courts have also been reluctant to distinguish between the content of particular messages, noting that "every person has a right to communicate with public officials calling attention to improper conduct and . . . the language used may be vehement, vituperative or abusive without violating the law." Martin v. United States, 691 F.2d 1235, 1240 (8th Cir.1982); see also Citizens United, 558 U.S. at 340-341 (noting that the "First Amendment stands against attempts to disfavor certain subjects or viewpoints" as well as "restrictions distinguishing among differing speakers" as "taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice"). To this end, the Supreme Court has protected a large number of speech and speech acts as "[t]he freedom of speech . . . guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 776 (1978) (internal quotation marks omitted).

Under the First Amendment, a wide variety of speech acts are protected, including, false statements, United States v. Alvarez, 567 U.S. 709, 722 (2012), obscene messages, Cohen v. California, 403 U.S. 15 (1971), and silence, West Virginia Board of Education v. Barnette, 319 U.S. 624 (1943). The First Amendment also protects conduct, if that conduct carries "[a]n intent to convey a particularized message" where "the likelihood was great that the message would be understood by those who viewed it." See Texas v. Johnson, 491 U.S. 397 (1989), *quoting* Spence v. Washington, 418 U.S. 405, 410-411 (1974). Examples of conduct that has been protected as communicative include students' wearing of black armbands to protest American military involvement in Vietnam, Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 505 (1969), a sit-in by African-Americans in a "whites only" area to protest segregation, Brown v. Louisiana, 383 U.S 131, 141-142 (1966), flag burning, Texas v. Johnson, 491 U.S. 397 (1989), and picketing about a wide variety of causes. See e.g., Snyder v. Phelps, 562 U.S. 443 (2011) (holding that a picket line formed in protest of the funeral of a U.S. Marine was protected by the First Amendment); U.S. v. Grace, 461 U.S. 171 (1983) (holding that picketing on the sidewalk outside the Supreme Court of the United States was protected by the First Amendment).

## I. THE FOUNDERS ENVISIONED THE PROTECTION FOR POLITICAL SPEECH AS A PROTECTION OF THE UTMOST IMPORTANCE AND § 875(C) IS UNCONSTITUTIONALLY OVERBROAD AS APPLIED HERE BECAUSE IT'S BREADTH CAPTURES POLITICAL SPEECH

There is no form or speech that enjoys more protection under the Constitution than political speech. In 2003, the Supreme Court describe political speech as being "at the core of what the First Amendment is designed to protect." Virginia v. Black, 538 U.S. 343, 365 (2003) (plurality opinion). This decision did not announce a new law. The Court merely stated a legal principle that dates back to the founding of the Republic. Protections for political speech, which

Justice Scalia defined as "the right of any person, or of any association of persons, to speak out on political matters," had already been envisioned by the time the Bill of Rights was proposed to Congress in 1789. Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 680 (1990) (Scalia, J., dissenting) (noting that the "Founders designed, of course, a system in which popular ideas would ultimately prevail; but also, through the First Amendment, a system in which true ideas could readily become popular."). The Supreme Court has recognized the centrality of political speech to the American system on a number of occasions. See, e.g., Roth v. United States, 354 U.S. 476, 484 (1957) ("The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people"); Terminiello v. City of Chicago, 337 U.S. 1, 4–5 (1949) ("[I]t is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes").

Under the Free Speech Clause, a government, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95 (1972). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." R.A.V. v. St. Paul, 505 U.S. 377, 395 (1992); Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 115 (1991). Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. E.g., Sorrell v. IMS Health, Inc., 131 S. Ct. 2653, 2663–2664 (2011); Carey v. Brown, 447 U.S. 455, 462 (1980); Mosley, supra, at 95. This commonsense meaning of the phrase "content

based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. Sorrell, 131 S. Ct., at 2664. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are subtler, defining regulated speech by its function or purpose. Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2227 (2015). Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny. Id. Laws that regulate content "cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" Id. (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). Furthermore, the Court has also noted "political speech must prevail against laws that would suppress it, whether by design or inadvertence." Citizens United v. FEC, 558 U.S. 310, 340 (2010). To this end, the Court has stated "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 457 (2007).

Thus, § 875(c) is unconstitutionally broad because it has the potential, as is the case here, to capture protected political speech in its reach. The level of protection afforded to political speech does not vary according to the "truth, popularity, or social utility of the ideas and beliefs which are offered." N.A.A.C.P. v. Button, 371 U.S. 415, 445 (1963). Rather, "the First Amendment . . . was designed to secure the widest possible dissemination of information from diverse and antagonistic sources." Buckley, 424 U.S. at 48-49, quoting New York Times Co. v. Sullivan, 376 U.S. 254, 266 (1964) (quotation marks omitted); see also Bridges v. California, 314 U.S. 252, 270 (1941) ("[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions."); United States v. Associated Press, 52

F. Supp. 362, 372 (S.D.N.Y. 1943) (noting that the First Amendment "presupposes that right

conclusions are more likely to be gathered out of a multitude of tongues, than through any kind

of authoritative selection. To many this is, and always will be, folly; but we have staked upon it

our all"). The Court has long recognized that political speech may be offensive, noting that

political speech "may indeed best serve its high purpose when it induces a condition of unrest,

creates dissatisfaction with conditions as they are, or even stirs people to anger" while also

striking "at prejudices and preconceptions and have profound unsettling effects as it presses for

acceptance of an idea." Terminiello, 337 U.S. at 4–5; see also Bridges, 314 U.S. at 268 ("It must

be recognized that public interest is much more likely to be kindled by a controversial event of

the day than by a generalization, however penetrating, of the historian or scientist"). With the

expansive protections afforded to political speech under the First Amendment, it is perhaps no

surprise that vitriolic, and even threatening, language has grown more popular in American

politics.

> a.   **The Court Should Apply the Statute Within the Context of the Public Controversy that Existed at the Time of Mr. Ziobrowski's Political Speech**

At the time of Mr. Ziobrowski's statement, immigration was, and indeed still is, a highly

polarizing subject of national debate. An increasing number of news agencies, organizations, and

individuals have expressed concern on social media sites regarding the harsh treatment of ICE

detainees and migrants across the country. As outlined above since the election of Donald

Trump, "outrageous story of overreach by various elements of immigration enforcement" has

become commonplace. Many, including elected officials, have called for the abolition of ICE,

some comparing its practices and methods to that of Nazi Germany.  Molly Roberts, *ICE*

*deserves to be abolished*, WASHINGTON POST, Mar. 13, 2018,

https://www.washingtonpost.com/blogs/post-partisan/wp/2018/03/13/of-course-democrats-

should-want-to-abolish-ice/?utm_term=.1461dd391cc3, ("Those who want to abolish ICE have a strong argument. They're not saying the agency is useless, and they're not saying it's a money-sink. They're saying it does active harm"); Sean McElwee, *It's Time to Abolish ICE: A mass-deportation strike force is incompatible with democracy and human rights*, THE NATION, Mar. 9, 2018, https://www.thenation.com/article/its-time-to-abolish-ice/, ("The idea of defunding ICE has gained traction among immigrant-rights groups horrified by the speed at which, under President Donald Trump, the agency has ramped up an already brutal deportation process"). https://twitter.com/luzenlafrontera/status/1109904711786749954 ("ICE should be fucking abolished. We are literally operating a stormtrooper Gestapo force that terrorizes immigrant communities, & rips families apart. This is fascism. This is repression. & if you think that's hyperbolic, you obviously don't talk to many immigrants. #AbolishICE").

President Trump and his Republican allies have consistently and repeatedly used violent language in expressing their position in the immigration debate. The following are illustrative of the current political rhetoric and political debate.

- At a March 2016 rally in Missouri, President Trump stated in reference to protestors: "You know, part of the problem, and part of the reason it takes so long, is nobody wants to hurt each other anymore, right? And they're being politically correct the way they take them out, so it takes a little bit longer. And honestly, protesters, they realize it. They realize that there are no consequences to protesting anymore. There used to be consequences, there are none anymore." Anna Giaritelli, *Trump: Protestors should face consequences*, WASHINGTON EXAMINER (Mar. 11, 2016, 7:10 PM), https://www.washingtonexaminer.com/trump-protesters-should-face-consequences

- At a March 2016 rally in Michigan, President Trump stated in reference to protesters being removed from the venue: "Yeah, get him out. Try not to hurt him. If you do, I'll defend you in court. Don't worry about it." Gabriella Muñoz, *Maxine Waters: 'The President lied again'*, WASHINGTON TIMES (Jun. 26, 2018), https://www.washingtontimes.com/news/2018/jun/26/maxine-waters-the-president-lied-again/

- At a February 2016 rally in Iowa, President Trump stated in reference to protestors: "Knock the crap out of him, would you? Seriously, okay, just knock the hell . . .  I

promise you, I will pay for the legal fees. I promise. I promise." Ben Jacobs, *Trump campaign dogged by violent incidents at rallies*, THE GUARDIAN (Mar. 11, 2016, 12:28 PM), https://www.theguardian.com/us-news/2016/mar/11/donald-trump-campaign-claims-violence-rallies

- In a 2015 phone interview, President Trump stated in reference to a protestor who was attacked at a rally: "Maybe he should have been roughed up."  Jenna Johnson and Mary Jordan, *Trump on rally protestor: 'Maybe he should have been roughed up'*, WASHINGTON POST (Nov. 22, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/11/22/black-activist-punched-at-donald-trump-rally-in-birmingham/?utm_term=.2be422f5d589

- In a 2018 Twitter post regarding former Vice President Joe Biden, President Trump stated: "Crazy Joe Biden is trying to act like a tough guy. Actually, he is weak, both mentally and physically, and yet he threatens me, for the second time, with physical assault. He doesn't know me, but he would go down fast and hard, crying all the way. Don't threaten people Joe!" Donald Trump (@realDonaldTrump), TWITTER (Mar. 22, 2018), https://twitter.com/realDonaldTrump/status/976765417908776963

- In a May 2019 rally in Panama City, Florida, President Trump was praising the border patrol's bravery in light of the fact that they do not carry weapons, when he questioned how to "stop these people." When a supporter shouted to shoot them, "The crowd exploded in laughter. The president grinned and shook his head. "Only in the panhandle you can get away with that statement, folks," Trump said to applause." See Eric Levitz, The President's 'Jokes' About Shooting Migrants Are No Laughing Matter, INTELLIGENCER, (May 9, 2019), http://nymag.com/intelligencer/2019/05/watch-trump-rally-shoot-migrants-panhandle-militia-detained.html.

President Trump has also "normalized" the use of violent political speech in making a point at his rallies. For example, in a May 2019 rally in Panama City, Florida, President Trump praised the border patrol's bravery in light of the fact that they do not carry weapons, and then posed a rhetorical question as how they "stop these people." See Eric Levitz, *The President's 'Jokes' About Shooting Migrants Are No Laughing Matter*, NEW YORK MAGAZINE INTELLIGENCER, (May 9, 2019), http://nymag.com/intelligencer/2019/05/watch-trump-rally-shoot-migrants-panhandle-militia-detained.html. When a supporter shouted to shoot them, "The crowd exploded in laughter. The president grinned and shook his head. 'Only in the panhandle you can get away with that statement, folks,' Trump said to applause." Id.

His message was clearly received by his supporters. Armando Gonzalez, a member of the New Mexico Militia Group allegedly questioned the apprehension policy, according to The Young Turks: ""Why are we just apprehending them and not lining them up and shooting them" . . . . "We have to go back to Hitler days and put them all in a gas chamber." <u>See</u> Ken Klippenstein, *'Put Them All in a Gas Chamber,' Said Border Militia Member: Report*, THE YOUNG TURKS, (May 6, 2019). In light of the current political climate in which immigration is a highly discussed and debated topic that permeates everyday life and media reports almost daily, Mr. Ziobrowski's tweet should be read as protected political speech, not a threat to injure another.

## II.  NONE OF THE RECOGNIZED EXCEPTIONS TO THE FIRST AMENDMENT ARE APPLICABLE TO MR. ZIOBROWSKI'S POLITICAL SPEECH

Despite such efforts to protect the sanctity of political speech, the Supreme Court has created exceptions to protected speech such as incitement, <u>Brandenburg v. Ohio</u>, 395 U.S. 444, 447–449 (1969) (per curiam) (government is only permitted to "forbid or proscribe" advocacy surrounding force and law violations where (1) "such advocacy is directed to inciting or producing imminent lawless action" and (2) the advocacy "is likely to incite or produce such action."), obscenity,[1] <u>Roth v. United States</u>, 354 U.S. 476, 484 (1957) ("But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance"), and fighting words, <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 572 (1942) ("'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace . . . are [not an] essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality").

---

[1] Defendant anticipates that the Government will concede to the fact that his tweet does not contain obscenity and thus does not analyze such exception at length here.

### a. The True Threats Exception Does Not Apply in this Case

The political speech made by Mr. Ziobrowski was a vitriolic and sarcastic expression of his outrage. It was neither specifically directed at a specific individual nor imminent. Within the context of Mr. Ziobrowski's history of making political points in like manner and the political environment within which he made the speech, it did not constitute a true threat. Generally, the First Amendment does not protect threats of physical violence. See R. A. V. v. St. Paul, 505 U. S. 377, 388 (1992). However, statutes criminalizing threatening speech "must be interpreted with the commands of the First Amendment clearly in mind," and it is "true threats" that are devoid of constitutional protections. Watts v. United States, 394 U.S. 705, 707 (1969) (per curiam). Given the importance of First Amendment protections surrounding political speech, courts have taken care to separate "true threats" from "political hyperbole," as "[t]he language of the political arena, like the language used in labor disputes is often vituperative, abusive, and inexact." Id. at 708. "We are mindful that in this nation there is a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." Watts v. United States, 394 U.S. 705, 708 (1969) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)).

"True threats" were defined by the Court as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Virginia v. Black, 538 U.S. 343, 359-360 (2003). Furthermore, the Court noted that "a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people

'from the possibility that the threatened violence will occur.'" Id. at 360. "True threats" also include intimidation, "where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." Id.

In United States v. Kelner, the Second Circuit recognized the importance of political speech when it adopted "a narrow construction of the word 'threat' in the statute . . . 18 U.S.C. s 875(c), as approved in Watts." United States v. Kelner, 534 F.2d 1020, 1027 (2d Cir. 1976) (finding "threats punishable consistently with the First Amendment were only those which according to their language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected 'vehement, caustic . . . unpleasantly sharp attacks on government and public officials.'"). Under Kelner, "only unequivocal, unconditional and specific expressions of intention immediately to inflict injury may be punished" as these types of threats "are of the same nature as those threats which are . . . 'properly punished every day under statutes prohibiting extortion, blackmail and assault without consideration of First Amendment issues.'" Id., quoting Watts, 402 F.2d at 690. The Kelner court further emphasized that it intended to narrow the scope of 18 U.S.C. § 875(c) to threats that are "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." Id. In line with the Second Circuit's approach in Kelner that provides wide latitude to various forms of political speech, courts have recognized various limitations to the true threat doctrine. Unlike in Kelner, where the Court reasoned that the defendant's specific, imminent, unambiguous statement constituted a threat of violence against an individual, Mr. Ziobrowski did not speak with specificity, imminence, or unambiguity.

Indeed, a communication may also fall short of a "true threat" due to a lack of specificity. See United States v. Baker, 890 F. Supp. 1375, 1385 (E.D. Mich. 1995), aff'd sub nom. United States v. Alkhabaz, 104 F.3d 1492 (6th Cir. 1997) (holding that private emails sent between two individuals that described "shared fantasies" about violent attacks on women did not constitute a "true threat" and were thus protected under the First Amendment as they did not form an "unequivocal, unconditional, immediate and specific threat conveying an imminent prospect of execution"). Mr. Ziobrowki's tweet also lacks the specificity required to constitute a true threat. As in Baker, where the defendant simply expressed his desire to cause violence against women over an email with another, Mr. Ziobrowski expressed his desire to see harm to the limited audience of his Twitter followers. It also lacked any specificities in regard to when, how, why, whom, etc. Unlike Jeffries, where the defendant sent a video of himself expressing his desire to cause harm to judge and lawyers involved in his custody dispute, Mr. Ziobrowski failed to have any personal connection to ICE or specify the harm intended. Indeed, unlike Jeffries, who stated: "the sh*t needs to stop cause you're gonna lose your job/ And I guarantee you, if you don't stop, I'll kill you," Mr. Ziobrowski lacked such specificity. 2010 WL 4923335. Indeed, most of the tweets that contain vulgar speech lacked the requisite specificity to consider the tweet more than "political hyperbole." See, c.f., United States v. Olson, 629 F. Supp. 889, 894 (W. D. Mich. 1986) (holding threats made in context of defendant's political views not a threat).

A communication may fall short of forming a true threat where the speaker is "[m]erely wishing or hoping that harm would come to another." United States v. Kosma, 951 F.2d 549, 554 (3d Cir. 1991). In United States v. Daulong, the court held that the defendant's communication did not form a true threat where the defendant claimed that, if someone did not kill the President, then the defendant "had a notion to do it himself" and he "hoped" somebody killed the president

that night. <u>United States v. Daulong</u>, 60 F. Supp. 235, 236 (W.D. La. 1945). The court in

<u>Daulong</u> recognized that the defendant's communication fell "considerably short of an

expression of determination or intent to do the act itself," and noted that the defendant's

communication "[i]n effect . . . says that the speaker feels like doing it, if someone else does not,

but here again, this cannot be construed as an intention, determination or purpose to perform the

deed." <u>Id.</u> Importantly, the court recognized that the statute "does not penalize the imagining,

wishing or hoping that the act will be committed by someone else." <u>Id.</u>; <u>but see United States v.</u>

<u>Christenson</u>, 653 F.3d 697 (8th Cir. 2011) (affirming defendant's conviction where defendant

repeatedly and specifically threatened the lives of President Obama and his family through

emails sent to specific people that said "kill Obama MRS[.] OBAMA AND THE . . . KIDS!" and

"i (sic) want to see obama's (sic) blood spilled all over the white house make it pink" and stated

that he would kill the president if he could, accused the president of being a communist, accused

the president of committing treason, acknowledged he would be willing to go to jail); <u>United</u>

<u>States v. Mann</u>, No. 99-4115, 2000 WL 372243, at *1 (8th Cir. 2000) (upholding conviction

under 18 U.S.C. § 871(a) where defendant mailed a letter to the president stating that he "should

live no longer" and "change" was needed "by force if need be ... as we become your worst

dream."). In these cases, the courts concluded that a reasonable recipient could conclude that the

threats "contained sufficient unambiguous threatening language" so as to constitute a true threat.

<u>United States v. Mann</u>, No. 99-4115, 2000 WL 372243, at *1 (8th Cir. 2000).

Here, Mr. Ziobrowski's tweet fails to meet a "true threat" and resembles more closely

"political hyperbole" or a mere wish or hope that harm would come and thus lacked the

specificity required to constitute a true threat. As in <u>Daulong</u>, where the court failed to find the

intent necessary to constitute a true threat where the defendant expressed his desire for the

President to be dead, Mr. Ziobrowski here only expressed a desire for harm to ICE, but lacked the specific and present ability to do it himself. Indeed, Mr. Ziobrowski's social media pages are riddled with numerous instances of political hyperbole and his social media use is largely expressive frustrations with the current administration. In light of the current political climate, such expressions do not convey an explicit desire to cause harm but rather a frustration with the administration's treatment of immigrants. Mr. Ziobrowski is not the only commentator on social media to express similar frustrations and opinions. In <u>Christenson</u>, the Eighth Circuit upheld the conviction for the defendant who had twice in an email sent to the White House servers expressed: "I HATE MY COUNTRY I HATE YOU ALL you like you pay others to lie fuck you and your actors you god damn pieces of shit i want to see obama's (sic) blood spilled all over the white house make it pink. GOD DAMN THE USA." <u>United States v. Christenson</u>, 653 F.3d 697 (8th Cir. 2011). Here, Mr. Ziobrowski's tweet was not mailed directly to the recipient as were the threats in <u>Christenson</u> and <u>Mann</u>. Additionally, the tweet lacked the specific and unambiguous language necessary to place a reasonable recipient in apprehension of imminent danger. In sum, it is a constitutionally protected political speech.

b.     **The Fighting Words Exception Does Not Apply in the Instant Case.**

The Supreme Court has also carved out a narrow exception for "fighting words" which are so inherently deleterious to social order, <u>see</u> <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 572 (1942); <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 308 (1940), and so inherently unrelated to the "robust" political debate necessary to a democratic society, <u>see</u> <u>Watts</u>, supra, 402 F.2d at 683 n.17, that the umbrella of the First Amendment does not protect the threat from governmental restriction. In <u>Chaplinsky</u>, the Supreme Court recognized an exception for fighting words, defined as "those which by their very utterance inflict injury or tend to incite an immediate

breach of the peace." 315 U.S. 568, 572. In <u>Cohen v. California</u>, the Supreme Court reversed the conviction for a defendant who wore a jacket with the words "Fuck the draft," in a courtroom to protest the Vietnam War and the draft. 403 U.S. 15, 16 (1971). The Court determined "No individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult. Nor do we have here an instance of the exercise of the State's police power to prevent a speaker from intentionally provoking a given group to hostile reaction." <u>Id.</u> at 20.

The <u>Lewis</u> court determined that that fighting words exception "might require a narrower application in cases involving words addressed to a police officer, because "a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" <u>Lewis v. City of New Orleans</u>, 415 U.S. 130, 135 (1974). In <u>City of Houston v. Hill</u>, the Supreme Court invalidated a city ordinance that criminalized any interruption of police officer because the ordinance "criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement." 482 U.S. 451, 462, 466 (1987).

Here, Mr. Ziobrowski's speech is similar to that in <u>Cohen</u> where both were intended to be political expressions and not fighting words. Furthermore, as Mr. Ziobrowski did not direct the tweet at the ICE agency specifically, no individual was "likely to be present" to have regarded the words as a direct insult. Additionally, Mr. Ziobrowski is not a celebrity or political figure with thousands of followers on Twitter and as a result, his tweet was likely not circulated to a large audience where it could have been seen by ICE agents. Indeed, at the time of the tweet, Mr. Ziobrowski had less than 500 followers and the post itself received zero "retweets" and only 2 "likes." As in the <u>Lewis</u> case, where the Supreme Court determined that police officers are less

likely to respond to fighting words, so too are ICE agents. Indeed, ICE is considered a part of the executive branch and thus not unfamiliar with the current administration's stance on immigration and its duties in furtherance of such policies.

As in Hill, where the statute criminalizing interruptions of a police officer was found to be unconstitutional for its arbitrary enforcement, so too should the statute here. As evidenced, Mr. Ziobrowski is not the only Twitter user to express his political opinions online. Indeed, President Trump, other members of the GOP, and individual supporters of Trump have expressed violent or threatening sentiments at campaign rallies, in public, and online. Due to the politically charged climate surrounding hate speech and anti-immigrant sentiment, the Government is seeking arbitrary enforcement of a statute usually used to deter individuals from making specific threats against specific enforcement officers.

However, where the speech is specifically directed at those involved in the arrest, detention, and prosecution of a criminal defendant in an attempt to intimidate or secure the release of such defendant, the threat may constitute extortionate threats. See United States v. Tinico, 730 Fed. Appx. 581, 585 (10th Cir. 2018) (holding where defendant specifically encouraged officers to search his vehicle, targeted those officers for harassment, and threatened them on Facebook, the threats constituted true threats); United States v. White, 654 Fed. Appx. 956, 958 (11th Cir. 2016) (holding true threat existed where defendant sent emails and posted online threats to kidnap, rape, and murder Florida state officials and their families for arresting other members of American Front). In Tinico, the defendant, in an effort to protest marijuana laws, falsely reported to CBP that his vehicle contained marijuana, engaged with officers as they searched his vehicle, questioned the officers' authority to enforce the laws, threatened to "have [their] head," as they searched, and then tried to instigate a shoot-out between himself and the

officers on Facebook two days later. <u>United States v. Tinico</u>, 730 Fed. Appx. 581, 585 (10th Cir. 2018). Tinoco also commented: "I can tell you right now you ... are a superstar. I can see the cameras everywhere.... Smile honey, ... you're going to be famous.... Extra, extra, read all about it. holes in your brand new outfit"; "[y]ou may quote me. I mean every fucking word." <u>Id.</u> at 584. Tinoco posted on Facebook the following messages directed at the magistrate judge who had authorized the warrant: "I shall [figuratively speaking] cut your fucking head off with this shit ... this is my machete ... for your ignorance does not constitute authority"; "when all is [said] and done, someones (sic) mothafucking (sic) fingers are being cut off [speaking figuratively]. Are they mine or yours?" <u>Id.</u> The court reasoned that these statements constituted true threats given that the officers testified that they took them seriously and he repeatedly commented that he "mean[t] every word," and "You can quote me." <u>Id.</u> In <u>White</u>, the court concluded that the threats to kidnap, rape, and murder the judge and the officers involved in the prosecution of other members of the American Front unless they released the members constituted a true threat. <u>United States v. White</u>, 654 Fed. Appx. 956, 958 (11th Cir. 2016). The court concluded that the threats were made in an attempt to secure the release of other neo-Nazi Southern Front members being prosecuted on different charges. <u>Id.</u>

Unlike these cases, Mr. Ziobrowski's statement was not made in an attempt to threaten or extort law enforcement to perform a particular act. Furthermore, the tweet itself was not directed to specific law enforcement or a specific person to whom Mr. Ziobrowski had a connection. The statement was also not made in an effort to effect any change in the behavior or conduct of specific law enforcement agents.

c. **The Obscenity Exception Does Not Apply in the Instant Case.**

In <u>Miller v. California</u>, the Supreme Court emphasized that "[i]n the area of freedom of speech and press the courts must always remain sensitive to any infringement on genuinely serious literary, artistic, political, or scientific expression." 413 U.S. 15, 22 (1973). To determine whether the speech is obscene. the basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. <u>Id.</u> Here, the lack of sexual conduct or expression in the tweet itself prevents the Government from claiming the obscenity exception applies.

## CONCLUSION

Accordingly, the Defendant, by and through his counsel, moves this Honorable Court to dismiss the charge against him.

Respectfully submitted,

/s/ Derege B. Demissie

_____
Derege B. Demissie
DEMISSIE & CHURCH
929 Massachusetts Avenue, Suite 101
Cambridge, MA 02139
(617) 354-3944
BBO# 637544

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 10, 2019.


/s/ *Derege B. Demissie*
DEREGE B. DEMISSIE